UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDWARD OZGA and ROBIN OZGA,<br>　　　Plaintiffs,<br><br>　　　v.<br><br>STEPHEN ELLIOT, THOMAS PORTER,<br>JEREMY BUSA, and MARK BEAL,<br>　　　Defendants. | No. 3:12-cv-00231 (JAM) |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

On the afternoon of September 27, 2011, young Joseph Ozga tragically took his life with a gun at his home in Southington, Connecticut. He took his life shortly after a dispute with his father—plaintiff Edward Ozga. Convinced that Joseph had been stealing from him, Ozga angrily called 9-1-1 to have Joseph removed from the home. When the police arrived just a few minutes later, they found Joseph on the floor, barely alive and with a gunshot wound to the head.

It is clear now that Joseph's death was a suicide. But that was far from clear when the police first arrived and when they were met at the door by an angry Edward Ogza and then soon discovered Joseph's body inside. The police promptly detained Ogza in handcuffs in a police car outside the house for about 20 minutes, while an ambulance came to rush Joseph to the hospital. The police then removed Ogza from the police car and removed his handcuffs. Ogza alleges that he was then ordered by a senior police official to go with a police detective to the police station to furnish a statement. Late in the afternoon as Ozga was completing his statement to the police and about to leave, the police advised him that they had heard from the hospital that Joseph had died. Ozga was devastated by this news and very upset that he had not been at the hospital—rather than the police station—to be with his son.

Ozga has now filed this lawsuit principally claiming that he was subject to false arrest

and false imprisonment by the police that day. I conclude that all the police officer defendants have qualified immunity from this lawsuit—that no reasonably objective police officer would have known that the police were violating Ogza's rights by initially detaining him and then by conducting the later investigation at the police station as they did. Accordingly, I will grant defendants' motion for summary judgment.

### BACKGROUND

For purposes of my review of defendants' summary judgment motion, I must consider the facts in the light most favorable to plaintiffs as the non-moving parties.[1] Plaintiffs Edward and Robin Ozga lived in September 2011 with their son, Joseph, in Southington, Connecticut. Joseph had a history of drug addiction and had recently admitted to his parents that he had stolen $8,000 or $9,000 and jewelry from them. Joseph had also previously expressed thoughts of harming himself, had been diagnosed with a major mental illness, and had been hospitalized because of threats of suicide. *See* Doc. #23-2 at 2; Doc. #29-2 at 3, 8; Doc. #30 at 4.

### *Events at the Ozga Home*

On September 27, 2011, Edward Ozga was at home with his son, while Robin Ozga was at her job where she worked as a nurse. A dispute arose between Ozga and Joseph after Ozga noticed that his video recorder was missing and accused Joseph of stealing it. Ozga was mad and aggravated. He called his son a drug addict and a thief and told him that now he would go to jail as he then called 9-1-1 to summon the police. *See* Doc. #29-2 at 5, 20; Doc. #23-15 at 3.

In response to Ozga's 9-1-1 call, Officer Thomas Porter of the Southington Police

---

[1] Accordingly, additional facts in the records that are favorable to the defendants but are not undisputed are not described in this ruling. Edward Ozga originally brought this action with his wife, Robin Ozga, alleging additional common law causes of action including reckless infliction of emotional distress, negligent infliction of emotional distress, and invasion of privacy. Plaintiffs, however, have withdrawn each of those claims, and plaintiff Robin Ozga no longer has any claims at issue because she does not contend that she was subject to false arrest or false imprisonment.

Department—who is one of the four named defendants in this action—promptly arrived at the house at about 2:00 pm. Ozga met Officer Porter at the front door, and Ozga was still angry; he told Officer Porter that Joseph was "ripping [him] off," and told Porter to "Get him the f\*\*k out of here." Doc. #29-2 at 15, 29; *see also* Doc. #29-4 at 4 ("I met Porter outside and said this f\*\*king a\*\*hole is stealing again and I want him to leave."). Porter asked if there were any weapons in the house, and Ozga advised that he had a gun. Doc. #29-4 at 4.

Ozga then directed Officer Porter inside to the lower level living room of the home where Officer Porter saw a body lying on the floor, unresponsive with blood on his shoulder and neck and with a gun on the floor beside him. There is no indication that anyone heard a gunshot. Officer Porter asked Ozga if the body on the floor was Joseph, and Ozga came up behind Officer Porter and confirmed that it was. Ozga then stooped down to try to pick up the gun, but Officer Porter told him not to touch it. Officer Porter immediately called dispatch reporting that shots had been fired and summoning an ambulance on a "Priority 1" urgent basis. *See* Doc. #23-2 at 3; Doc. #29-2 at 7-8; Doc. #29-4 at 5.

### *Events in the Police Car*

About two minutes later, Officer Stephen Elliot—another named defendant in this case—entered the house. Officer Porter told Officer Elliot to secure Ozga in his squad car outside the house. According to Ozga, Officer Elliot was aggravated and angry; he grabbed Ozga by the arm, "horse-collared" him by grabbing his shirt collar at the front of his neck, and led him into the driveway. There, he patted Ozga down for weapons, handcuffed him, and secured him in the back of the police squad car. Ozga told Officer Elliot that he needed to call his wife Robin, and Officer Elliot said the police would do so. According to Ozga, Officer Elliot twice advised him that he was under arrest and did so despite Ozga's protest that he had not done anything wrong.

3

*See* Doc. #23-2 at 4; Doc. #29-2 at 10-14, 18; Doc. #29-4 at 5; Doc. #30 at 4-5.

A third officer—Officer Jeremy Busa, who is also another named defendant in this action—was assigned to supervise Ozga while he sat in the police car. When Ozga asked Officer Busa about calling his wife, Officer Busa allegedly replied, "Why don't you just shut up and sit there." Doc. #29-2 at 15; Doc. #30 at 5.

Ozga remained detained in the car for about 20 minutes. During that time he saw paramedics arrive and then remove Joseph (who appeared to be still breathing) on a stretcher from the home. Doc. #23-2 at 4; Doc. #29-2 at 18-19; Doc. #30 at 5.

Detective Mark Beal—the last of the four defendants sued by Ozga in this action—arrived on the scene and asked the other officers to take Ozga out of the car. The officers let Ozga out and removed the handcuffs. *See* Doc. #29-2 at 22. At no time was Ozga subject again to any physical restraint by the police.

Detective Beal then told Ozga that he was going to do a gunshot residue (GSR) test on Ozga's hands, to which Ozga consented. Doc. #23-2 at 5; Doc. #29-2 at 22–23. Detective Beal swabbed Ozga's fingers, and Lieutenant Michael Shanley came over and asked Ozga what had happened. Doc. #29-2 at 23-24. After Ozga told Lieutenant Shanley the sequence of events, Shanley allegedly told him, "You have to go to the police station and give a statement." Doc. #29-2 at 24. According to Ozga, Lieutenant Shanley "[i]nsisted I go give a statement." *Ibid.; see also* Doc. #29-4 at 5 ("I was told by Shanley I must go with Beal to give a statement at the police station."). Lieutenant Shanley said that Detective Beal would drive Ozga to the station and take his statement.[2]

### *Events En Route to and at the Southington Police Station*

---

[2] Lieutenant Shanley was initially a named defendant in this lawsuit but passed away during the litigation of this matter and is no longer named as a defendant. Doc. #38.

Ozga rode in the front seat of Detective Beal's police car to the Southington police station. He remained without handcuffs or any physical restraint throughout the car ride. Doc. #23-2 at 5; Doc. #29-2 at 25. During the drive to the station, Detective Beal allegedly said to Ozga that he knew that Ozga had not shot the gun because the GSR test came back negative. *Id.* at 26. When Ozga asked what Beal thought had happened, Detective Beal responded, "Your son got caught stealing, he got pissed off, went downstairs and shot himself." *Ibid.*

Upon arriving at the police station, Ozga remained without any kind of physical restraint, and he walked alongside Detective Beal without any physical contact to an interview room. Doc. #29-2 at 25. Detective Beal showed Ozga into an interview room, which was video-equipped to record all the subsequent events that took place that afternoon in the room. A DVD of the video-recording is a part of the summary judgment record that I have reviewed. Doc. #23-25.[3]

Shortly after Ozga arrived with Detective Beal at the interview room, Detective Beal left the room and returned with a consent form for the GSR test that had been administered at Ozga's home. Detective Beal stated, "I took it, you consented to it, you allowed me to take it. This is just the form that we use. I didn't have one of these forms out in the field." Exh. M (2:20). Detective Beal read the consent form aloud to Ozga, and Ozga agreed and signed the form as reflected on the video. *See also* Doc. #23-24 at 2 (consent form).

Detective Beal then interviewed Ozga for about an hour-and-a-half from approximately 3:25 p.m. to 4:55 p.m. Doc. #29-2 at 28-29; Exh. M (2:25-3:55). Throughout the video, the door

---

[3] The video was submitted as Exhibit M to defendants' motion for summary judgment. The video is date-and-time-stamped throughout so that it is possible to identify the specific time at which all portions of the interactions with Ozga took place. It is undisputed, however, that the time-stamp that appears on the video is one hour behind the real time that the events took place. My citations in this ruling to the video will be abbreviated as "Exh. M" and followed by the time that the reference appears as reflected on the video (one hour behind the actual time).

of the interview room remained closed except as one or more officers or Ozga himself went in and out. Ozga was not in handcuffs, and there were no actions taken by any police officers to restrain his movements in the room. Ozga was not told that he was under arrest or read any *Miranda* rights.

As shown in the video, Ozga was seated next to Detective Beal at a computer terminal for the purpose of generating a written statement, and the computer monitor was turned so that Ozga could simultaneously see what Detective Beal was typing. The resulting written statement is part of the summary judgment record. Doc. #23-15.

As Detective Beal began typing the first paragraph of Ozga's statement, Ozga silently read what was on the screen and added additional information for purposes of composing his statement. For example, Detective Beal typed the following: "My name is Edward . . ." and Ozga confirmed the spelling of his last name, "O-Z-G-A." *See* Exh. M (2:23).

Detective Beal proceeded to interview Ozga in this manner and simultaneously type his statement on the computer. Ozga recounted the day's events to Beal who wrote down his words and read them back to him to ensure that they were accurate. When Ozga finished telling what happened, Detective Beal asked him to review the full written statement so he could correct any errors or omissions. Detective Beal then read the entire statement aloud to Ozga.  Exh. M (3:08). This included an out-loud reading of the following passage from the first paragraph of the statement, stating in part that Ozga was not under arrest and was free to leave:

> I live at 949 South End Rd., Southington, Connecticut and make the following statement to Detective Mark Beal of the Southington Police Department. I know I am not under arrest and can leave at any time. I am making the following statement of my own free will and am aware it can be used as evidence in a court of law. I have not been threatened in any way or made any promises in return for this statement. I am also aware that a person is guilty of making a false statement under oath under section 53a-157 of the Connecticut General Statutes. This statement is about what happened at my home today with my son Joe Ozga.

*Ibid.; see also* Doc. #23-15 at 2 (written statement). Detective Beal read the rest of the statement aloud, making corrections with Ozga. He then printed out a copy for Ozga, instructed him to read it again, and Detective Beal left the room after telling him he would be right back. Exh. M (3:23-3:24).

Although Detective Beal closed the door behind him, he did not tell Ozga that he could not leave the room. As the video shows, Ozga continued while alone in the room to read the written statement, and then after a few minutes he opened the door, inquired of someone out in the hallway where he could find a bathroom, and then he left the room. Exh. M (3:33).

What happened next outside the room is not on video. According to Ozga, Detective Beal showed him where the bathroom was located, but then followed him in, waiting inside while he used the bathroom. Doc. # 30 at 6.

The video indicates that Ozga and Detective Beal re-entered the interview room together and were seated again. Exh. M (3:35). At this point, Detective Beal asked Ozga more questions about the gun and about what he saw when he first saw his son lying on the floor, and these questions led to Detective Beal adding more to the written statement on the computer screen. Ozga then asked Detective Beal what he thought had happened. Exh. M (3:44). Detective Beal hesitated before answering. He said that the police needed to learn how the gun got into Joseph's hand and who fired the gun; he suggested that it was an open question whether Ozga had fired the gun, and he observed that there was a time gap when both Ozga and Joseph had access to the gun. Detective Beal then asked Ozga if he had fired the gun, and Ozga denied firing the gun. *Ibid.* Detective Beal followed up by adding another sentence to the statement with Ozga's consent that "[a]t no time did I ever shoot my gun today and I never shot the gun at my son." Doc. #23-15 at 5.

7

As Detective Beal printed out the final draft for Ozga to read and verify, Ozga asked, "Are we gonna be here much longer in the station? Can we go back to the house?" Detective Beal responded, "Yeah, we'll be able to go back to the house." Exh. M (3:46). As Ozga again read his written statement, Detective Beal left the room and said he would be back. *Id.* (3:47). About two minutes later he returned with another officer, Sergeant Suski, to serve as a witness to Ozga's signing of the final written statement. *Id.* (3:51). The statement reflects that it was completed at 4:55 p.m. Doc. #23-15.

As indicated on the video, Detective Beal then explained to Ozga that the police also wanted to test his clothing for gunshot residue and asked for his consent to leave his clothing before he went home so that the clothing could be tested. Exh. M (3:54). Ozga consented, but before he could remove his clothing, Sergeant Suski then interrupted to explain to Ozga that his son's injuries had been very serious and that Sergeant Suski had learned from the hospital that Joseph had died. *Id.* (3:56).

As the video shows, Ozga became very distraught and tearful at hearing this news. Exh. M (3:56). Ozga was concerned about what he would tell his wife, and he was told that she was at the hospital talking to the doctors. *Ibid.* Ozga was also upset at Detective Beal because he had told Ozga that "it wasn't bad," and Beal responded to Ozga that "I didn't know, I didn't know." *Ibid.* Ozga cried out, "I need somebody, I need somebody," and Sergeant Suski told him, "What we'll do is we'll try to get you to the hospital." *Id.* (3:57). Sergeant Suski offered to call any friends or other family if Ozga wished him to. *Ibid.* Ozga told the officers, "You should have taken me at least to say goodbye to him. Now I can't even do that." *Id.* (3:59). Sergeant Suski offered again to take Ozga to see his son at the hospital, to which Ozga responded "I don't want to see him now." *Ibid.*

8

Ozga complained again that the police could have brought him to the hospital before and that he had been treated "like a criminal" by the police at his house. *Id.* (4:01). Detective Beal explained that the officers who arrived at the scene had to be concerned that there might be someone in the house who had shot Ozga's son and that they had to do all that they could to secure the scene. *Id.* (4:03).

Detective Beal and Sergeant Suski asked Ozga to consent to leave his outer clothing with them to conduct further tests for gunshot residue. Ozga signed a consent form and then changed into police-provided hospital scrubs. *Id.* (4:05-4:08). At Ozga's request and in his presence, Sergeant Suski called Ozga's employer to let him know what happened and to ask him to pick up Ozga from the station. *Id.* (4:10-4:11). Ozga's sister called the police station, and the police asked him whether he wished to speak to her, but Ozga said that he was not ready to speak with her. *Id.* (4:15-4:16).

Before Ozga left the police station, he allowed the officers to take his fingerprints, and he signed another consent form. He left the interview room at 5:22 pm to wait for his employer to pick him up from the police station lobby. Exh. M (4:22).

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v.*

*Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### A. The Fourth Amendment and False Arrest/Seizure

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "False imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Green v. Donroe*, 186 Conn. 265, 267 (1982). Claims of false arrest and false imprisonment are interchangeable, and—to the extent that they serve as a predicate for constitutional claims pursued under § 1983—both claims require proof that a plaintiff was subject by a state actor to an unlawful seizure of his person under the Fourth Amendment. *See Russo v. City of Bridgeport,* 479 F.3d 196, 204, 208-209 (2d Cir. 2007).

What is a "seizure" for purposes of the Fourth Amendment? A seizure of a person may occur in at least two ways. First, a seizure occurs if the police intentionally terminate one's freedom of movement by means of physical force or restraints. *See Brendlin v. California,* 551 U.S. 249, 254 (2007); *United States v. Freeman*, 735 F.3d 92, 96-97 (2d Cir. 2013). Classic examples of this kind of physical seizure include a formal arrest or other bodily restraint. Second, a seizure occurs if the police intentionally terminate one's freedom of movement without the use of physical force but by means of a command or show of official law

enforcement authority. *See Brendlin*, 551 U.S. at 254; *United States v. Simmons*, 560 F.3d 98, 105-06 (2d Cir. 2009). Classic examples of what I will refer to as a "show-of-authority" seizure include an ordinary traffic stop or an obligatory command by a police officer to a pedestrian to stop and furnish identification.

For cases of show-of-authority seizure, a substantial question often arises—precisely because the police have not used tangible physical force or restraints—about how to determine if a person has been seized. On the one hand, not every encounter with the police amounts to a seizure, and "mere questioning by the police does not constitute a seizure." *Muehler v. Mena*, 544 U.S. 93, 100 (2005). Nor does a voluntary appearance at a police station constitute a seizure. *See, e.g, Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*).

On the other hand, an encounter with the police may become so circumstantially coercive that it amounts to a seizure. Among the circumstantial factors that may bear on whether a show-of-authority seizure has occurred is "the threatening presence of several officers," or "the display of a weapon," or the "physical touching of the person by the officer," or "language or tone indicating that compliance with the officer was compulsory," or "a request by the officer to accompany him to the police station or a police room." *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007).

Whether someone has been seized in this show-of-authority context does not depend on whether the police believe they are acting coercively. To the contrary, the focus is on whether a reasonable person would believe he has been seized. A court must inquire in light of all the circumstances "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter" with the police. *Brendlin*, 551 U.S. at 255. "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into

account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (*per curiam*); *see also Salmon v. Blesser*, 802 F.3d 249, 252-53 (2d Cir. 2015).

Of course, if the police decide to arrest someone, the Fourth Amendment requires that the police have probable cause to support the arrest. *See, e.g., Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015). But even if probable cause is lacking, a police officer may briefly seize or detain someone for a limited investigative purpose. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 30 (1968). For such a limited investigative detention, the police must have at least "reasonable suspicion"—a standard that is more than a mere hunch or surmise but less than the standard of probable cause required for an arrest. *See, e.g., United States v. Bailey,* 743 F.3d 322, 331–32 (2d Cir. 2014); *see also Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) (discussing distinction between arrests and *Terry* stops involving limited investigative detention).

### B. Qualified Immunity in the False Arrest Context

All that said, not every unlawful seizure by a police officer entitles a plaintiff to an award of money damages under § 1983. That is because a police officer is entitled to qualified immunity if "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson*, 793 F.3d at 263; *see also Amore v. Novarro*, 624 F.3d 522, 529-30 (2d Cir. 2010).

The purpose of qualified immunity is to allow government officials to do their job free from doubt that they will be sued and liable for money damages because of actions they took that a court might one day decide was unlawful but that an objectively reasonable official at the time

would not have known to violate anyone's rights. Qualified immunity "protects all but the plainly incompetent or those [government officials] who knowingly violate the law." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (*per curiam*). Likewise, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks,* 134 S.Ct. 2369, 2381 (2014).

Qualified immunity principles may apply to the kinds of claims of false arrest and false imprisonment that are asserted in this case. For example, if the police arrest a suspect, they have qualified immunity from a claim of false arrest so long as they had at least *arguable* probable cause for an arrest (even if *actual* probable cause is later deemed lacking). *See, e.g., Betts v. Shearman,* 751 F.3d 78, 83 (2d Cir. 2014). For the same reason, if the police conduct a limited investigative detention, they have qualified immunity so long as they had at least *arguable* reasonable suspicion to warrant the limited detention. *See, e.g., Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009) (*per curiam*).

Qualified immunity may also protect a police officer from a claim of false arrest if an objectively reasonable officer would not have known that a suspect had been seized in the first place. After all, if the police officer does not know in the first instance that a person has been seized, then the officer cannot know that the law required him to have some factual basis such as probable cause or reasonable suspicion in order to initiate or continue an encounter with that person.

Of course, for the case of a seizure by means of an ordinary arrest or other physical restraint, it should be obvious to a police officer that a seizure has occurred. The police officer can see it with his or her own eyes. But if a claim of seizure stems from a show-of-authority by the police, then the issue may be less than obvious, because—as discussed above—the very

13

existence of a show-of-authority seizure turns upon circumstantial inferences that a reasonable person would draw based on assessment of the conduct of the police.

It follows that a court confronts a somewhat complicated inquiry of shifting objective mental perspectives when the rule of qualified immunity ("would a reasonable police officer know he was violating the law?") is overlaid with the rule of when there has been a show-of-authority seizure ("would a reasonable person dealing with the police have felt free to leave?"). I think that the combination of these two rules means that I must resolve a police officer's entitlement to qualified immunity by asking the following question: would an objectively reasonable police officer necessarily have believed, in light of all the circumstances known to the actual defendant police officer that a reasonable person in the plaintiff's position would *not* have felt free to terminate his encounter with the defendant police officer? In this manner, qualified immunity may apply if reasonable law enforcement officers could disagree about whether a person has been seized.

The defense of qualified immunity may be invoked at any stage of litigation. Where, as here, qualified immunity is asserted at the summary judgment stage, a court may grant judgment if it is clear—after viewing the facts in the light most favorable to plaintiff—that reasonable law enforcement officers could have disagreed about whether defendants' conduct violated the law. *See, e.g., Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015).

### C. Ozga's Claims

Ozga's false arrest and false imprisonment claims stem from two aspects of his interactions with the police on September 27, 2011. The first was his interaction with Officers Porter, Elliot, and Busa relating to his detention in the police car outside his home. The second

14

was his interaction with Detective Beal relating to his transport to the police station and

subsequent questioning there. I will address each of these in turn.

### 1. Detention in Police Car Outside Home (Porter, Elliott, Busa)

Viewed in the light most favorable to Ozga, the facts show that, shortly after his son's

body was found with a gun next to it, Ozga was forcibly detained in a police car outside his

home by Officer Elliot who was acting on Officer Porter's instruction to secure him there. Ozga

was handcuffed and remained in the police car for about 20 minutes. During that time, Officer

Busa refused to let him call his wife. After about 20 minutes, Ozga was permitted at Detective

Beal's direction to be released from the car and his handcuffs were removed. Ozga consented at

that time to Detective Beal's request for a GSR test of his hands.[4]

These facts easily suffice to establish a genuine issue of fact that Ozga was seized within

the meaning of the Fourth Amendment until at least the point when he was released from the car

and his handcuffs were removed. For qualified immunity purposes, however, the question is

whether any objectively reasonable law enforcement officer would have known such seizure to

be unlawful. I do not think so.

A reasonable law enforcement officer could conclude that Ozga's temporary detention in

the immediate aftermath of the discovery of a gun shot victim was a sensible measure well

within the bounds of a permissible limited investigative detention. In light of Ozga's angry call

to the police and his continuing show of anger at his son upon the police's arrival, the police had

at least arguable reasonable suspicion at the time to believe that it was Ozga who had shot his

son. Alternatively, it was reasonable for the police to be concerned that Ozga's son may have

been shot by someone else who could be lurking in the vicinity. Under either scenario, it was

---

[4] Because it was Beal who arranged upon arrival for Ozga to be removed from the car and released from
his handcuffs, Ozga has no tenable claim against Beal stemming from Ozga's detention in the car. Ozga's claim
against Beal stems wholly from Beal's later transport to and questioning of Ozga at the police station.

reasonable for the police to ensure that Ozga was contained and secure while the police made an initial assessment of what had happened and whether there was a continuing risk of violence or foul play.[5]

Nor would a reasonably objective police officer have believed that the length of duration—about 20 minutes or so—was unlawful. While the Supreme Court has declined to establish a bright-line rule for the permissible duration of an investigative *Terry*-type detention, it is clear that a valid detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500 (1983) (plurality opinion). The reasonableness of the duration depends in large part on "whether the police diligently pursue[d] their investigation" in a manner to confirm or dispel their reason for suspicion and detention. *United States v. Place,* 462 U.S. 696, 709 (1983).

Here, there was no needless investigative delay, because the police, upon Detective Beal's arrival at the scene, promptly released Ozga from the car for him to take part in a GSR test, to which he consented, to determine if there was evidence that he had recently fired a gun. Upon completing that test, Ozga was not handcuffed or further restrained. As I have previously concluded in a similar legal context, "in cases where law enforcement officers have conducted their investigations without needless delay, numerous courts have found investigative detentions of fairly substantial length—anywhere from thirty minutes to nearly three hours—to be constitutionally reasonable." *Crismale v. Reilly*, 2014 WL 3738151, at *4 (D. Conn. 2014) (citing numerous case examples from prior to the date of the incident in this case in September 2011). Ozga had no clearly established right not to be temporarily detained as he was in the

---

[5] I need not resolve whether each one of the officers individually knew all of the facts that formed the basis for reasonable suspicion because "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).

police car, and it follows that none of the defendants acted objectively unreasonably.

In any event, even if an objectively reasonable officer would not have believed that Ozga could be lawfully detained for investigative purposes, a reasonable officer would have believed that Ozga could be temporarily detained for general safety purposes in light of Ozga's evident anger and that gun as well as a gunshot victim lay immobile in the house. "Police have a duty to protect both the lives and the property of citizens," and "[i]n performing this duty, they are required to protect against crime without waiting for it to occur." *United States v. Markland*, 635 F.2d 174, 176 (2d Cir. 1980); *see also United States v. Garner*, 416 F.3d 1208, 1212-15 (10th Cir. 2005) (describing scope of community caretaking function).

Ozga argues that his handcuffing meant that he was under formal arrest. But an objectively reasonable police officer would not necessarily conclude from the fact that Ozga was handcuffed while in the police car that he was therefore "arrested" and that police must have probable cause—rather than merely reasonable suspicion—to subject Ozga to continued detention. As the Second Circuit has observed, "not every use of handcuffs automatically renders a stop an arrest requiring probable cause to satisfy Fourth Amendment reasonableness," and "[t]he relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." *United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) (citing *United States v. Newton*, 369 F.3d 659, 674–75 (2d Cir. 2004)); *see also Muehler*, 544 U.S. at 99-100 (police officers executing search warrant of house seeking weapons and evidence of gang membership in wake of drive-by shooting acted reasonably by detaining occupant in handcuffs for two to three hours while search was in progress).

For purposes of summary judgment, I must credit Ozga's contention that he was told by

Officer Elliot that he was under arrest. But this statement does not undermine my qualified immunity conclusion, because the fact that Ozga was told that he was under arrest does not determine whether the facts independently justified his detention for *non*-arrest, limited investigative detention purposes. Indeed, a police officer's mistaken legal conclusion does not amount to a violation of the Fourth Amendment if the facts as known to the police officer otherwise justify his action. *See, e.g., Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *Jaegly v. Couch*, 439 F.3d 149, 153-54 (2d Cir. 2006) (Sotomayor, J.). No matter if Elliot personally considered Ozga to be under arrest, qualified immunity still applies because a reasonably objective police officer could have believed that Ozga was lawfully subject to limited detention in the police car.

Qualified immunity protects those three officers—Officers Porter, Elliot, and Busa—who were involved with respect to Ozga's initial detention in the police car outside his house. Because Ozga does not allege any additional interactions or misconduct that day involving Officers Porter, Elliot, and Busa, I will grant summary judgment in favor of each of them on qualified immunity grounds. Ozga's remaining claims of false arrest and false imprisonment concern only the actions of the last remaining defendant—Detective Beal—to whom I now turn.

### 2. Ozga's Transport to and Questioning at Police Station (Beal)

Ozga argues that he was subject to false arrest and imprisonment when he was transported by Detective Beal to the Southington police station. For summary judgment purposes, I must credit the facts that he cites in support of his claim that a reasonable person would not have felt free to decline to go to the police station with Detective Beal. First, he contends (as discussed above) that Officer Elliott had already told him that he was under arrest. Second, he contends that a supervising officer—Lieutenant Mark Shanley—ordered him to go to

18

the police station for questioning. In light of these factual allegations, I conclude that at least a genuine issue of fact remains whether Ozga was seized for Fourth Amendment purposes when he was transported to and then questioned at the police station. This is not to negate countervailing facts suggesting that he was not seized but only to acknowledge that a genuine fact issue remains.

And if a genuine fact issue remains that Ozga was seized during the course of his ride to and questioning at the police station, a genuine fact issue likewise remains that this seizure was unlawful. If the seizure is deemed an arrest, it was unlawful because defendants do not contend that there was at any time probable cause for an arrest. Nor can the seizure be justified as a permissible *Terry* stop of limited investigative detention. The length of Ozga's seizure for several hours of combined transport and questioning well exceeded the limited scope of a permissible *Terry* stop. The *Terry* rule—and the benefit it offers the police of invoking a lower standard of reasonable suspicion rather than probable cause—allows for on-the-scene, clearly time-limited investigative measures, and it does not license the police to detain a suspect and then transport him for extended questioning at the station house. *See Kaupp*, 538 U.S. at 630.

Thus, a genuine fact issue remains to suggest that Ozga was subject to an unlawful seizure throughout the time that he was allegedly directed by Lieutenant Shanley to go to the police station and then subject to extended questioning there. Still, however, I must consider the separate question of whether Detective Beal is entitled to qualified immunity for that claim of unlawful seizure, and I conclude that he is.

To begin with, there is nothing in the summary judgment record to support a claim that Detective Beal ordered Ozga's alleged seizure. To the contrary, it was Detective Beal who upon his arrival at the scene ordered Ozga *released* from the police car and then his handcuffs were

removed. At no time during Detective Beal's subsequent dealings with Ozga was Ozga physically restrained in any manner.

The only issue then is Detective Beal's qualified immunity with respect to Ozga's claim that he was subject to a show-of-authority seizure. As discussed above, the relevant—and somewhat complicated—inquiry in this context is whether an objectively reasonable police officer would necessarily have believed in light of all the circumstances known to Detective Beal that a reasonable person in Ozga's position would not have felt free to terminate his encounter with Detective Beal. Even viewing the facts in the light most favorable to Ozga, my answer to that question is "No."

As an initial matter, there is no evidence that Detective Beal was aware that Officer Elliot had previously told Ozga that he was under arrest. The summary judgment record is clear that Detective Beal did not arrive on the scene until *after* Ozga was already confined by Officer Elliott in the police car. As the Second Circuit has explained, "the direct physical participation of the defendant in the constitutional violation is not alone a sufficient basis for holding the defendant liable if the defendant had no awareness or notice of the facts that rendered the action illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001). Thus, for example, if "a defendant police officer arrests a person pursuant to an apparently valid arrest warrant but, unbeknownst to the defendant, the arrest warrant was procured through perjurious affidavits of other police officers motivated by racial bias," the arresting police officer would not be liable for false arrest notwithstanding his direct participation in a wrongful arrest. *Ibid.* The same holds true here where there is no evidence that Detective Beal knew of Officer Elliott's statements to Ozga about Ozga being under arrest.

Nor does Ozga contend that it was Detective Beal who ordered Ozga to go to the police

station for questioning. Although Ozga claims (and I must credit the claim for purposes of summary judgment) that Lieutenant Shanley ordered him to go to the police station for questioning, the record is silent whether Detective Beal was party to or heard these purported orders from Lieutenant Shanley to Ozga. If he did not hear them, then there is no basis at all for Detective Beal to have assumed that Ozga was involuntarily accompanying him by reason of a police order; if so, then Detective Beal would have had no reason to believe Ozga to be seized by means of a show of police authority.

On the other hand, even assuming that Detective Beal overheard Lieutenant Shanley's directive to Ozga, Lieutenant Shanley is a higher level police official than Detective Beal. The fact that Detective Beal followed his superior's orders is further reason to conclude that an objectively reasonable officer in Detective Beal's position would not believe his own conduct to be unlawful. *See, e.g., Lauro v. Charles*, 219 F.3d 202, 216 n.10 (2d Cir. 2000). Under either scenario (that Detective Beal did or did not hear Lieutenant Shanley's orders to Ozga), there is no basis to conclude that Detective Beal knew Ozga to be seized by means of a show of police authority and hence that—lacking probable cause to arrest Ozga—it would be unlawful for him to transport Ozga to the police station for Ozga to give a statement.[6]

This conclusion is reinforced by the circumstances of the transport of Ozga to the police station. Ozga was not restrained in any way and rode in the front seat of the police car with Detective Beal driving. These facts are inconsistent with the idea that Detective Beal should have concluded that Ozga was under arrest.

Detective Beal is also entitled to qualified immunity with respect to Ozga's claim that he was unlawfully seized while at the police station for several hours of questioning. First and

---

[6] I would reach the same conclusion with respect to whether an objectively reasonable official in Detective Beal's position could have believed that Ozga voluntarily consented to accompany Detective Beal to the police station.

21

foremost, Ozga's claim is plainly at odds with his own signed and sworn statement—and that the video shows was read aloud to him—in which he stated: "I know I am not under arrest and can leave at any time."

Hours of video do not disclose Ozga complaining that he was under arrest or that he could not leave the police station if he wanted to. In view of Ozga's express acknowledgment that "I know I am not under arrest and can leave at any time," it is untenable to conclude that an any objectively reasonable officer in Detective Beal's position would have believed that Ozga's presence in the police station was involuntary and unlawful in violation of the Fourth Amendment.

The remainder of the video is radically inconsistent with Ozga's contention that he was seized or in legal custody while at the police station. He was interviewed in a highly cooperative and non-adversarial manner, sitting side-by-side with Beal at a computer station to produce his formal statement.[7] Although the door of the interview room was generally closed throughout the questioning session, Detective Beal never told Ozga that he was not free to leave. Ozga on his own initiative left the room during a break to find the bathroom.[8] Toward the close of the interview, Sergeant Suski offered in Detective Beal's presence to take Ozga to the hospital (an

---

[7] Notwithstanding the rule that the facts must be viewed in the light most favorable to plaintiff when a court considers a defendant's motion for summary judgment, summary judgment may not be defeated by allegations that are "blatantly contradicted" by video footage. *See Scott v. Harris,* 550 U.S. 372, 379–80 (2007). Here, the videotape of plaintiff at the police station plainly contradicts Ozga's testimony at his deposition that Beal was "rough" with him at the police station, Doc. #29-2 at 30, and that "three-quarters of the way" through his interview that he asked to speak to his brother who is an attorney. *Id.* at 32. Ozga's opposition to summary judgment also includes an affidavit from his brother attesting that he called the police station and asked to speak to Ozga, *see* Doc. #29-3, but this affidavit is not specific as to the time that he called or with whom he spoke. *Cf. Moran v. Burbine,* 475 U.S. 412 (1986) (failure to inform detained suspect of attorney's telephone call did not deprive him of information essential to his ability to knowingly waive his Fifth Amendment rights to remain silent and to the presence of counsel).

[8] For summary judgment purposes, I credit Ozga's claim that he was under surveillance by Beal while he was in the bathroom, although this aspect of their interaction was not recorded on video. Even accepting this allegation, Beal could have had legitimate concerns in light of the shooting that day not to have Ozga left inside the police station where he could not be monitored at all. The fact that Beal monitored Ozga while in the bathroom would not compel an objectively reasonable officer to conclude that Ozga was under arrest or otherwise seized.

offer that Ozga refused). And both Sergeant Suski and Detective Beal spoke with Ozga about

arrangements for Ozga's friend to pick him up from the station. All these facts negate any

conclusion that an objectively reasonable officer in Detective Beal's position would necessarily

have believed that Ozga was seized while at the police station and therefore that Detective Beal

should have known or believed his own conduct to be unlawful.

### State Law Claim for False Imprisonment

In addition to his federal claim under § 1983 for false arrest (Count One), plaintiff has

also brought a state law claim of false imprisonment (Count Five). Under Connecticut law,

"'[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical

liberty of another.'" *Russo*, 479 F.3d at 204 (*quoting Outlaw v. City of Meriden*, 43 Conn. App.

387, 392, 682 A.2d 1112 (1996)). To prevail, "the plaintiff must prove that his physical liberty

has been restrained by the defendant and that the restraint was against his will, that is, that he did

not consent to the restraint or acquiesce in it willingly." *Berry v. Loiseau*, 223 Conn. 786, 820,

614 A.2d 414 (1992).

The immunity enjoyed by officials under state law is distinct from that under federal law.

*See Mulligan v. Rioux*, 229 Conn. 716, 726–31, 643 A.2d 1226 (1994); *see also Fleming v. City*

*of Bridgeport*, 284 Conn. 502, 531, 935 A.2d 126 (2007). Under state law, public employees are

immune from suit for discretionary acts committed in their public role unless one of three narrow

exceptions applies:

> First, where the circumstances make it apparent to the public officer that his or
> her failure to act would be likely to subject an identifiable person to imminent
> harm . . . second, where a statute specifically provides for a cause of action
> against a municipality or municipal official for failure to enforce certain laws . . .
> and third, where the alleged acts involve malice, wantonness or intent to injure,
> rather than negligence.

*Id.* at 531–32. The police's initial detention of Ozga, their transport of Ozga to the police station,

23

and their taking of a statement from Ozga at the police station were undoubtedly discretionary law enforcement acts and subject to none of the immunity exceptions described above. *See, e.g.*, *Pinnock v. City of New Haven*, 553 F. Supp. 2d 130, 144 (D. Conn. 2008). Accordingly, I find that defendants are entitled to governmental immunity and I grant summary judgment as to Ozga's remaining state law false imprisonment claim.

CONCLUSION

The loss of a child may be the most devastating event that any parent could suffer. I have no doubt that Edward Ozga, Robin Ozga, and their loved ones have suffered greatly from the loss of Joseph Ozga, and I regret ruling today in a manner that may add to their pain. But I have to respect that police officers have a very hard job to do and often in a haze of highly uncertain circumstances. That is why a police officer may not be subject to a constitutional lawsuit for money damages unless he reasonably would have known that he was violating someone's constitutional rights. Even if I were to assume that the police should have handled their investigation in a way that was more sensitive to Edward Ozga, I cannot conclude that any of the police officer defendants objectively would have known that they were violating his constitutional rights.

Defendants' motion for summary judgment (Doc. #23) is GRANTED. Judgment shall enter in favor of defendants Porter, Elliott, Busa, and Beale as to all claims against them. The Clerk of Court shall enter judgment and close this case.

It is so ordered.

Dated at New Haven this 21st of December 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge